NOT FOR PUBLICATION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |  |
|---|---|---|
| Melanie WILSON, | : | |
| | : | |
| Plaintiff, | : | Civil No. 16-7915 (RBK/JS) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| STATE OF NEW JERSEY, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**KUGLER**, United States District Judge:

This matter comes before the Court upon Defendants' Motion for Summary Judgment (Doc. 81). For the reasons expressed in the opinion below, Defendants' motion is hereby **GRANTED** in part as to Plaintiff's individual claims against Daniel Opperman, Erin Nardelli, and Charles Egbert, Plaintiff's New Jersey Family Leave Act ("NJFLA") claim, and Plaintiff's gender discrimination claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and the New Jersey Law Against Discrimination ("NJLAD"). The remainder of Defendants' motion is **DENIED**.

## I.     BACKGROUND

This case arises from Plaintiff Melanie Wilson's employment with Defendant Bayside State Prison ("Bayside"), a government-operated male prison in the county of Cumberland in New Jersey. (Doc. 21, Amended Complaint ("Compl.") ¶5.) Plaintiff began working at Bayside as a Communications Operator in 2000, and became a Union Representative in 2013. (Doc. 82,

Defendant's Statement of Material Facts ("Def. SOF") ¶¶1, 3.) In her role as Operator, Plaintiff's job duties included handling prison staffing and scheduling. (*Id.* ¶2).

Defendants in this case include the State of New Jersey, the New Jersey Department of Corrections, Bayside State Prison, the County of Cumberland, and individuals Charles Egbert, Erin Nardelli, and Daniel Opperman.[1] The New Jersey Department of Corrections ("NJDOC") is a government agency in Trenton, New Jersey. (Compl. ¶2.) Defendant State of New Jersey oversees the NJDOC; Defendant County of Cumberland operates and oversees both the NJDOC and Bayside State Prison. (Compl. ¶¶3–4.) Defendant Lt. Charles Egbert was one of Plaintiff's supervisors at Bayside. (Compl. ¶6.) Defendant Erin Nardelli was another Bayside employee who was responsible for handling investigations of workplace environment claims. (*Id.* ¶7.)

The events giving rise to this case occurred in relation with Plaintiff's job at Bayside between December 2013 and June 2016. In December 2013, Defendant Daniel Opperman, then employed at Bayside as a Sergeant, claims he overheard Plaintiff speaking with Lieutenant Patrick Pinder, another Bayside employee. (Def. SOF ¶¶6–9.) During this conversation, Plaintiff and Lt. Pinder allegedly expressed annoyance with another Bayside Operator, Ms. Tepper, and discussed replacing her. (*Id.*) Around this time, Sgt. Opperman and Operator Tepper became convinced that Plaintiff and Lt. Pinder were having a romantic relationship and complained that it was negatively affecting the workplace. (*Id.* ¶¶12–14.) On December 21, 2013, Operator Tepper wrote a letter detailing these allegations to Defendant Erin Nardelli, the Assistant Superintendent of Bayside and liaison for the Equal Employment Division ("EED"). (*Id.*) Ms. Nardelli received similar messages on January 13, 2014 from two more Bayside employees alleging that Plaintiff was improperly paid

---

[1] The parties previously stipulated to the dismissal of the two other individual Defendants, Varrell and Saraceni, on April 30, 2019. (Doc. 80).

overtime and subject to preferential treatment due to her perceived relationship with Lt. Pinder. (*Id.* ¶¶18–21.)

Based on these notes, Ms. Nardelli initiated an ethics investigation. (Def. SOF ¶24.) She asked Lt. Pinder whether he and Plaintiff were romantically involved; he answered negatively, stating that they were simply close family friends. (*Id.* ¶¶25–26.) Lt. Pinder retired in May 2014, and he and Plaintiff claim they began seeing each other romantically in August 2014. (*Id.* ¶30.) The investigation was dropped, and no adverse actions were taken against Plaintiff based on the alleged workplace relationship.

On March 17, 2014, Denise Cunningham, a Senior Corrections Officer ("SCO") at Bayside, had a verbal altercation with Harry Shelton, a Bayside Sergeant. (Def. SOF ¶95.) Afterwards, she was disciplined for disrespecting Sgt. Shelton (*Id.*) SCO Cunningham argued that Sgt. Shelton was discriminating against her on the basis of sex; in response, the EED Director told her that she could file a complaint if she wanted to. (*Id.* ¶¶101–103.)

Around the time of the Cunningham-Shelton altercation, Plaintiff claims she began regularly communicating with Ellis Allen, the Assistant Chief Investigator of the Special Investigations Division of the Department of Correction in Trenton. (Doc. 86-2, Certification of Melanie Wilson ("Pl. Cert.") ¶3.) Plaintiff claims that she reported to Allen on the discriminatory practices she witnessed being applied to SCO Cunningham, such as a sergeant stating, "I want to work as far away from that bitch as possible," and the irregular manner in which SCO Cunningham was moved to different posts. (Pl. Cert. ¶6–8.)

On June 5, 2014, Operator Tepper yelled at Plaintiff in front of others at work, shouting, "Melanie's a fucking snitch! Someone needs to let her know that Pinder's not here anymore and nobody fucking cares!" (Def. SOF ¶41; Doc. 82-3, Def. Ex. 19.) Lt. Egbert responded by saying,

"That's ok, we know who the snitches are and we're gonna take care of that." (Def. SOF ¶43; Doc. 82-3, Def. Ex. 19.) Plaintiff reported their behavior the next day in an email to two Bayside employees, Major Schultheis and Major Redman. (Def. SOF ¶40.)

By reporting Lt. Egbert, Plaintiff caused the prison to reassign him a different area on June 10, 2014. (*Id,* ¶45.) The same day that Lt. Egbert was reassigned, an anonymous note reading "Snitch" was left on Plaintiff's desk. (*Id.* ¶48.) Later in the day, Lt. Egbert attempted to file disciplinary charges against Plaintiff for violating attendance policies; however, Major Schultheis indicated that the charges should not be brought because they appeared retaliatory. (Doc. 89-3 ¶21.) Finally, also on June 10, SCO Cunningham received an official written reprimand about the March 2014 verbal altercation with Sgt. Shelton. (Def. SOF ¶96–97; Pl. SOF ¶97.)

On June 22, 2014, Plaintiff found another note on her workstation, this one reading, "you'll get yours." (Def. SOF ¶54.) A third note appeared on June 30, reading "it's coming snitch." (*Id.* ¶55.) During the end of June, Plaintiff learned that the prison operators were circulating a petition criticizing Plaintiff's performance as union representative, asking that requests made by Plaintiff in her representative capacity not be entertained unless most operators also signed on. (*Id. ¶*53.) On July 8, 2014, Plaintiff was charged with chronic absenteeism and unsatisfactory attendance, along with failure to follow call-off or call-on procedures. (*Id.* ¶129.)

On July 13, 2014, SCO Cunningham filed her discrimination complaint with the DOC's EED, alleging discrimination on the basis of sex and retaliation. (Pl. SOF ¶104.) She claimed that her schedule was constantly changed irregularly after her altercation with Sgt. Shelton. (Def. SOF ¶107; Pl. SOF ¶107.) Two days after SCO Cunningham's complaint was officially filed, Ms. Nardelli contacted Plaintiff to tell her that an anonymous sender had mailed sexually suggestive nude photographs of Plaintiff to Nardelli through interoffice mail, to Major Schultheis' home, and

to Assistant Chief Allen's office in Trenton, NJ. (Pl. SOF ¶¶56–57; Def. SOF ¶¶56–57.) A letter included with the photographs alleged that Plaintiff was romantically involved with both Lt. Pinder and Major Schultheis. (*Id.*)

On July 29, 2014, Ms. Nardelli explained to Plaintiff that she could file an EED complaint about the incident with the nude photos. (*Id.*) The same day, Ms. Nardelli set a date in the SCO Cunningham investigation, August 4, to interview SCO Cunningham about her complaint. (Def. SOF ¶109; Pl. SOF ¶109.)

On August 8, 2014, Plaintiff received another anonymous note; this one stated, "never rat on your friends and always keep your mouth shut." (Def. SOF ¶70.) Three days later, an EED investigator began seeking scheduling records to corroborate SCO Cunningham's discrimination claim. (*Id.* ¶110.) On September 1, Plaintiff received an anonymous envelope, which she did not open, addressed to "operator snitch." (*Id.* ¶71.) The next day, Plaintiff filed a statement about the nude photos; she stated that her ex-husband took the photos, and she suspected that they were obtained and circulated by Bayside Operator Starcher, who had made comments to her in the past suggesting that he had obtained the photos. (*Id.* ¶74.)

On September 12, 2014, SCO Cunningham was informed that investigation into her complaint was completed. (Def. SOF ¶¶113–114.) However, the investigator relied on information received from Sgt. Opperman, an employee who had also allegedly discriminated against SCO Cunningham; because of this clear conflict, the investigation was reopened. (*Id.*)

On October 31, SCO Cunningham identified Plaintiff as a witness who would testify on her behalf. (*Id.* ¶118). On November 5, the EED completed its investigation into Plaintiff's sexual harassment and retaliation claims; it determined that the nude photos circulated of Plaintiff did not constitute sexual harassment, and found no evidence in support of Plaintiff's retaliation claim since

there was no prior EED history between Plaintiff and the anonymous sender of the photos. (*Id.* ¶78.) The following day, Plaintiff was interviewed about SCO Cunningham's complaint, and the investigator then re-submitted her Cunningham investigation report to include Plaintiff's information. (*Id.* ¶119–120.)

On December 9, 2014, Plaintiff appealed the EED's adverse determination on her complaint to the Civil Service Commission ("CSC"); the EED filed a response on December 30. (Def. SOF ¶¶83–84.) On February 3, 2015, while still waiting on the CSC's determination, Plaintiff filed a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging sex discrimination and retaliation. (*Id.* ¶¶131–132.) On February 9, the CSC decided Plaintiff's appeal, finding that the circulation of Plaintiff's nude photos violated the antidiscrimination policy. (*Id.* ¶85.) It further found that the EED had not interviewed necessary witnesses to Plaintiff's complaint, particularly since it did not interview Operator Starcher, who Plaintiff identified as the possible source of the photos. (*Id.*) Plaintiff's case was then remanded back to the EED. (*Id.*)

On April 7, 2015, the EED informed Plaintiff that it completed further interviews, and found no evidence that the state antidiscrimination policy had been violated. (Def. SOF ¶89.) In June 2015, the EEOC concluded that there was insufficient evidence of sexual harassment in retaliation for Plaintiff's participation in the EEO process. (*Id.* ¶136.)

Plaintiff filed her complaint in state court in September 2016, and Defendants then removed it to this Court. After a lengthy period of discovery, Defendants moved for summary judgment. (Doc. 81.)

## II.    LEGAL STANDARD

The court should grant a motion for summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a). An issue is "material" to the dispute if it could alter the outcome, and a dispute of a material fact is "genuine" if "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Matsushida Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968)). In deciding whether there is any genuine issue for trial, the court is not to weigh evidence or decide issues of fact. *Anderson*, 477 U.S. at 248. Because fact and credibility determinations are for the jury, the non-moving party's evidence is to be believed and ambiguities construed in her favor. *Id*. at 255; *Matsushida*, 475 U.S. at 587.

Although the movant bears the burden of demonstrating that there is no genuine issue of material fact, the non-movant likewise must present more than mere allegations or denials to successfully oppose summary judgment. *Anderson*, 477 U.S. at 256. The nonmoving party must at least present probative evidence from which jury might return a verdict in her favor. *Id.* at 257. The movant is entitled to summary judgment where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III. DISCUSSION

In the operative Complaint, Plaintiff brings four counts against Defendants: (I) unlawful discrimination, sexual harassment hostile workplace environment, and retaliation in violation of the New Jersey Law Against Discrimination ("NJLAD"); (II) unlawful discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); (III) violation of

the New Jersey Family Leave Act ("NJFLA"); and (IV) violation of the Fair Labor Standards Act ("FLSA").[2]

The Court notes that Plaintiff does not oppose granting Defendants' motion for summary judgment as to Count III; therefore, summary judgment is granted for Defendants on this count. (Pl. Mot. at 3.) Further, Plaintiff "does not oppose the dismissal of individual claims about Daniel Opperman, Erin Nardelli, and Charles Egbert on statute of limitations grounds." (*Id.*) Thus, claims against these individual Defendants are also dismissed. Plaintiff's remaining claims—retaliation, gender discrimination, and sexual harassment hostile workplace environment—are substantively addressed below.

Though alleged in different counts of the Complaint, Plaintiff's gender discrimination and retaliation claims are brought under both Title VII and the NJLAD. Because courts generally apply the same basic principles to claims brought under Title VII and the NJLAD, these claims will be analyzed together. *See Cortes v. Univ. of Med. & Dentistry of New Jersey*, 391 F. Supp. 2d 298, 311 (D.N.J. 2005) ("The analysis which is applied in Title VII claims is equally applicable to actions brought under other civil rights statutes, and thus the Title VII analysis applies to claims brought under the NJLAD as well.") (citing *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1212 (3d Cir.1995)); *Stallone v. Camden Cty. Tech. Sch. Bd. of Educ.*, Civ. No. 12-7356, 2013 WL 5178728, at *3 (D.N.J. Sept. 13, 2013) ("Because New Jersey courts have frequently looked to case law under Title VII for guidance in developing standards to govern the resolution of LAD claims, the Court will analyze the NJLAD claims together with the Title VII claims.") (internal citations omitted).

---

[2] The parties stipulated to the dismissal of Count IV on April 30, 2019 (Doc. 80). Accordingly, Count IV is not discussed herein.

### A. Retaliation Claims under Title VII and NJLAD

Counts I and II of Plaintiff's Amended Complaint assert claims of retaliation under Title VII and the NJLAD. In arguing for summary judgment, Defendants claim that Plaintiff cannot make a prima facie showing of retaliation.

"To establish a prima facie case of retaliation under either [Title VII or the NJLAD], an employee must show (1) that he or she engaged in protected activity, (2) that he or she was subjected to an adverse action by the employer, and (3) the existence of a causal link between the employee's protected activity and the purportedly adverse action." *Dalton v. New Jersey*, Civ No. 174094, 2018 WL 305326, at *10 (D.N.J. Jan. 5, 2018) (internal citations omitted).

Defendants claim that Plaintiff fails to show both element (1), that she engaged in a protected activity, and element (2), that she was subjected to an adverse employment action. (Def. Mot. at 12.) Alternatively, Defendants argue that even if Plaintiff could show both, she still could not show element (3), the required causal connection between the two. (*Id.*)

Plaintiff's retaliation claim stems from her assistance with SCO Cunningham's gender discrimination complaint: she argues that she faced adverse consequences as retaliation for reporting on her coworkers to help SCO Cunningham. (Pl. Resp. at 7.) Defendants argue that retaliation against Plaintiff's assistance is logistically impossible, since the allegedly retaliatory events—disciplinary charges, the "snitch" notes, and dissemination of her nude photos—occurred during the summer of 2014, and Plaintiff was not identified as a witness for SCO Cunningham until months later, in October 2014. (Def. Mot. at 21.) They argue that they could not conceivably have retaliated against Plaintiff's October 2014 activity in June 2014. (*Id.*)

In response, Plaintiff argues that she had been involved with SCO Cunningham's investigation prior to her official interview in October 2014 and had actually been aiding SCO

Cunningham with her complaint since April 2014. (Pl. Resp. at 7.) She argues that an issue of material fact exists as to whether she was helping SCO Cunningham prior to any retaliatory events, and claims that this factual dispute forecloses the possibility of summary judgment for Defendants. (Pl. Resp. at 4.) Defendants contend that this is not a legitimate factual dispute because Plaintiff only recently alleged supporting facts, and because of a lack of evidence in the existing record. (Def. Reply at 1.)

It is apparent from the record that a factual dispute exists as to whether Plaintiff was assisting SCO Cunningham's investigation prior to the "snitch" notes and photos. Defendant's argument, that Plaintiff lacks proof of earlier assistance, is undercut by the fact that Plaintiff indisputably received threatening notes calling her a "snitch." As it is unlikely that Plaintiff's coworkers would send multiple notes warning her to stop "snitching," or disseminate her impermissibly obtained nude photos for no reason, a jury could certainly reasonably find that the notes and photos were sent in response to Plaintiff's "snitching" on Sergeants Shelton and Opperman for their alleged harassment of SCO Cunningham. Defendants, seemingly anticipating this argument, proffer another reason for the snitch notes: that whoever sent the notes felt that Plaintiff was "snitching" on her coworkers to Lt. Pinder because of their perceived romantic relationship. (Def. Reply at 10.) However, whether the notes and photos were sent because of Lt. Pinder or because of the SCO Cunningham investigation is an issue of fact for a jury, and not this Court, to determine.

Having found that a disputed fact exists, the next determination to be made is whether it is an issue of *material* fact – meaning, whether Plaintiff's claims would fail as a matter of law even if a jury found that the notes, pictures, and disciplinary charges were a result of her aiding SCO Cunningham's complaint. *See, e.g., Isler v. Keystone Sch. Dist.*, 2008 WL 3540603 (W.D.Pa.

2008) (addressing whether the outcome of a factual dispute would be material in determining whether an activity constituted "protected activity"). This turns on whether Plaintiff's assistance constitutes a "protected activity" under Title VII or the NJLAD. If it is a protected activity, and if Plaintiff can make out the other elements required for a prima facie showing, then summary judgment must be denied because a jury could find as a factual matter that Plaintiff assisted SCO Cunningham. If it is not a protected activity, then summary judgment may be granted, because a jury's finding of assistance would not change the legal analysis or outcome.

### *Protected Activity*

Under both Title VII and the NJLAD, two categories of employee activity are protected: (1) "participating in certain Title VII proceedings" and (2) "opposing discrimination made unlawful by Title VII." *Tinio v. Saint Joseph Regional Medical Center*, 645 F. App'x. 173, 176 (3d Cir. 2016) (analyzing an employee's retaliation claim under both Title VII and the NJLAD). In activities falling into either the first "participation clause" or the second "opposition clause," "the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII." *Ford v. County of Hudson*, 2012 WL 2522954 at *10 (D.N.J. June 28, 2012).

Plaintiff argues that the "opposition clause" applies to her situation. (Pl. Resp. at 9.) In opposition clause cases, the NJLAD prohibits retaliation "on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by" the statute. N.J. Stat. Ann. § 10:5-12(d). To show protected activity under Title VII and the NJLAD, "the opposition clause does not require a formal letter of complaint to an employer or the EEOC as the only acceptable indicia of the requisite 'protected conduct.'" *Washco v. Federal Express Corp.*, 402 F.Supp.2d 547, 555 (E.D. Pa. 2005). Examples of protected opposition clause

activities may include "formal letters of complaint to an employer and the EEOC as well as informal protests of discriminatory employment practices." *Id*. The Third Circuit engages in a "case-specific inquiry. . . to determine whether conduct rises to the level of 'opposition' under Title VII." *Washco*, 402 F.Supp.2d at 555. In conducting the inquiry, courts "should analyze the message conveyed and not the medium of conveyance." *Id*.

Plaintiff, seizing on the NJLAD's language, alleges to have "aided and encouraged SCO Cunningham in late April-early May 2014 when she had discussions with SCO Cunningham's union representative [SCO Debellis] about discriminatory and retaliatory disciplinary charges, scheduling changes, and comments that were being made about SCO Cunningham by her supervisors." (Pl. Resp. at 7.) Plaintiff also states that in spring 2014 she regularly communicated with Ellis Allen, the Assistant Chief Investigator of the Special Investigations Division of the Department of Correction in Trenton. (Doc. 86-2, Certification of Melanie Wilson ("Pl. Cert.") ¶3.) Plaintiff claims that she reported to Allen the discriminatory practices she witnessed being applied to SCO Cunningham, such as a sergeant stating, "I want to work as far away from that bitch as possible," and the irregular manner in which SCO Cunningham was moved to different posts. (Pl. Cert. ¶6–8.) Plaintiff concedes that she did not become involved with the official EED investigation into SCO Cunningham's claim until November 2014, when she was asked to give a formal statement. (Pl. Cert. ¶30.) However, she argues that her reports to SCO Debellis and Assistant Chief Allen about the discriminatory comments and actions she witnessed, as well as her personally encouraging Cunningham to file a claim, constitute protected action. (Pl. Resp. at 7.)

Caselaw from courts within the Third Circuit supports Plaintiff's contention that she has engaged in protected activity under the opposition clause. For example, in *Brown v. Boeing Co.*, 468 F.Supp.2d 729, 736 (E.D.Pa. 2007), the court held that a "plaintiff's participation in an

employer's internal, in-house investigation, so long as no formal charge has been filed with the EEOC, is ordinarily not considered a protected activity under the *participation* clause," but such activity does "satisfy the *opposition* clause." *Id.* (emphasis added). In *Yatzus v. Appoquinimink Sch. Dist.*, 458 F.Supp.2d 235, 244 (D. Del. 2006), a court found the plaintiff engaged in protected activity by informing administrators of her supervisor's inappropriate sexual advances, despite the absence of any official complaint. In *Washco v. Federal Express Corp*, 402 F.Supp.2d 547, 555 (E.D. Pa. 2005), the plaintiff gave statements to assist an internal investigation into another employee's complaints of racial discrimination and was afterwards herself subject to disciplinary actions. The court found that her statements in the internal investigation, in which she detailed how she witnessed a supervisor treat her co-worker, constituted protected activity under the opposition clause because the "message conveyed" by her activity was that she opposed racial discrimination by the employer. *Id.*

Here, Plaintiff's statements to Allen, which allegedly occurred in spring 2014, constitute protected opposition under Title VII and the NJLAD. Her statements to Allen include reports on Bayside employees' discriminatory statements to and treatment of SCO Cunningham. Similarly, Plaintiff's alleged reporting to SCO Cunningham's union representative, SCO Debellis, would also constitute protected activity. (Doc. 86-2 ¶10.) Like in *Washco*, the "message conveyed" by Plaintiff's assistance is her opposition to gender discrimination by Bayside employees.

### Adverse Action

Plaintiff can show protected action, but to successfully make a prima facie case she next needs to show that she suffered an adverse employment action. An "adverse employment action" is defined in Title VII's retaliation provision as an action that is "materially adverse" and "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

*Yatzus*, 458 F. Supp. 2d at 243 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). Examples of adverse actions include "[r]efusal to hire, discharge, and conduct that alters an employee's 'compensation, terms, conditions, or privileges of employment,' deprives him or her of 'employment opportunities,' or 'adversely affect his [or her] status as an employee.' *Washco.*, 402 F. Supp. 2d at 556 (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir.1997)).

Plaintiff claims that the adverse actions against her were the June 2014 disciplinary charges brought against her by Lt. Egbert, the individual who stated "we know who the snitches are and we're gonna take care of that," as well as the "snitch" notes she received in June 2014 and the dissemination of naked pictures in July 2014. (Pl. Resp. at 12, 15.)

For purposes of making out a prima facie case, the June 2014 disciplinary charges from Lt. Egbert alone are enough to show adverse action, as such a reprimand "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Yatzus*, 458 F. Supp. 2d at 243 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

### *Causal Link*

To find a causal link in retaliation cases, "the Third Circuit has focused on two main factors." *Ford*, 2012 WL 2522954 at *10. Temporal proximity "is sufficient to establish the causal link." *Id*. Alternatively, a "plaintiff can also establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period." *Id*.

If Plaintiff assisted SCO Cunningham with her harassment claim in spring 2014, prior to the adverse actions against her beginning in June 2014, then she has made a prima facie showing of a causal link between the two. The factual background set out earlier details a number of times

when Plaintiff experienced an adverse event within days of new progress being made in SCO Cunningham's investigation.

Because a jury could determine that Plaintiff did in fact assist SCO Cunningham prior to summer 2014, the count of retaliation under Title VII and the NJLAD involves a genuine issue of material fact, and may not appropriately be decided on a motion for summary judgment. *See Ford,* 2012 WL 2522954 at *11 (finding summary judgment inappropriate on a retaliation claim under Title VII and the NJLAD where issues of fact existed). Thus, Defendants' motion for summary judgment is denied as to the retaliation claims.

### B.  Gender Discrimination Claim under Title VII and NJLAD

Defendants seek summary judgment on Plaintiff's Title VII and NJLAD gender discrimination claims, arguing that "Plaintiff cannot establish how she was treated differently based on her gender." (Def. Mot. at 24.)

Title VII of the Civil Rights Act of 1964 makes it unlawful for employers to "discriminate against any individual with respect to compensation, terms, conditions or privileges of employment, because of. . . sex." 42 U.S.C § 2000e–2(a)(1). As with retaliation, the Third Circuit's "discrimination inquiry is the same for claims filed under Title VII and the NJLAD." *Tourtellotte v. Eli Lilly & Co.*, 636 F.App'x 831, 842 (3d Cir. 2016).

To establish a prima facie case of gender discrimination "under either the federal or state statute, a plaintiff must first establish that: (1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) that adverse employment action gives rise to an inference of unlawful discrimination." *Tourtellotte*, 636 F. App'x at 842.

Summary judgment for Defendants is warranted on Plaintiff's gender discrimination claim because Plaintiff did not suffer an adverse employment action giving rise to an inference of unlawful gender discrimination. Even if Lt. Egbert's attempt to file disciplinary charges against Plaintiff constituted an adverse employment action, there exists no basis to infer that this charge was due to her gender. Rather, as Plaintiff herself suggests, the adverse inference one could make from this charge is that it was retaliatory. Nothing in the record suggests that Plaintiff's gender was involved in this adverse action. Because Plaintiff cannot make a prima facie case for gender discrimination, summary judgment for Defendants is appropriate on the count of gender discrimination under both Title VII and the NJLAD.[3]

### C. Sexual Harassment Hostile Work Environment Claim under the NJLAD

"Sexual harassment is a form of sex discrimination that violates" the NJLAD. *Lehmann v. Toys R Us, Inc.*, 132 N.J. 587, 601 (1993). Hostile work environment sexual harassment "occurs when an employer or fellow employees harass an employee because of his or her sex to the point at which the working environment becomes hostile." *Id*. The conduct at issue "need not be sexual in nature; rather, its defining characteristic is that the harassment occurs because of the victim's sex." *Id.* at 602.

A plaintiff alleging hostile workplace based on acts of sexual harassment must prove that "the complained-of conduct (1) would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a (3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." *Cutler v. Dorn*, 196 N.J. 419, 955 A.2d 917, 924 (N.J.2008).

---

[3] In her opposition brief, Plaintiff does not explicitly address or respond to Defendant's summary judgment argument on the gender discrimination count, instead focusing almost solely on the retaliation count. However, even if Plaintiff's counsel had not made this oversight, the gender discrimination claim would likely still fail due to the above analysis.

When evaluating hostile work environment claims, courts should consider the "totality of the circumstances," rather than "individual incidents." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482–84 (3d Cir.1990). Courts may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Feraro–Bengle v. Randstad North Am.*, L.P., 2006 WL 2524170, at *4 (D.N.J. Aug.30, 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks omitted)). Even "one incident of harassing conduct can create a hostile work environment." *Taylor v. Metzger*, 152 N.J. 490, 499, 706 A.2d 685, 689 (1998). But mere "speculations, generalities, and gut feelings, however genuine, do not permit an inference of discrimination to be drawn." *Chambers v. Heidelberg USA, Inc.*, No. 04–583, 2006 WL 1281308, at *6 (D.N.J. May 5, 2006) (citation omitted).

Defendants' argument for summary judgment on Plaintiff's sexual harassment count contends that: Plaintiff was not harassed by supervisors or coworkers based on gender; any harassment was not severe or pervasive; and even if Plaintiff was harassed, there is no vicarious liability because of the prompt measures Defendants took to address her complaints. (Def. Mot. at 33.)

### a. *"But for the Employee's Gender" Element*

Defendants argue that Plaintiff cannot show that the complained-of conduct—namely, the threatening notes, nude photos, and accusatory comments—would not have occurred but for her gender. (Def. Mot. at 27.) Defendants point out that the "snitch" notes made no reference to gender. (*Id.*) As to the nude photos, Defendants argue that these were sent not to harass Plaintiff because she is a woman, but because her coworkers were angry about her perceived romantic relationship

with Lt. Pinder. (*Id.* at 29.) They claim their gender-neutral argument is strengthened because "Lt. Pinder was also criticized for the behavior by his contemporaries." (*Id.*) Defendants seem to further suggest that circulation of private nude photos would be embarrassing for any employee, and do not specifically target Plaintiff as a woman. (*Id.*)

Viewing the record in the light most favorable to Plaintiff, the Court does not accept Defendant's argument that the alleged harassment was not based on Plaintiff's gender. The photos by themselves are sexual in nature. And as Defendants admit, the nude photos were accompanied with a letter stating that the photos were sent to "change the minds of those that think [Plaintiff] is some naïve and innocent little girl," and suggesting that the sexual nature of the photos shows that Plaintiff is a "manipulative liar." (Def. Mot. at 29.) The reference to gender within the letter relies on outdated stereotypes of women; the same sentence would not have been included if the photos depicted a male employee. Defendants' argument that Lt. Pinder was also criticized does nothing to help their case: sexually explicit material depicting Lt. Pinder was never shared, further suggesting that Plaintiff's photos would not have been disseminated but for her gender.

The Court finds that dissemination of a female plaintiff's nude, sexually suggestive photos can be enough to satisfy the "because of sex" element of hostile workplace environment sexual harassment. This finding is supported by another district court within the Third Circuit. In *Phillips v. Donahoe*, Civ. No. 12-410, 2013 WL 5963121, at *14 (W.D. Pa. Nov. 7, 2013), the court held that because the plaintiff's coworkers had shared her nude photos, "a reasonable jury could conclude that [the plaintiff] was subjected to discrimination because of her sex, that the discrimination was sufficiently severe to alter the terms, conditions, or privileges of her employment, and that an objectively reasonable employee in her situation would have found her work environment to be hostile or abusive." Similarly here, distribution of Plaintiff's sexually

explicit photos, particularly when accompanied with a note stating that she is a "manipulative liar" and is not a "naïve and innocent little girl" because she posed for private sexual photos outside of work, is enough to satisfy the "because of sex" element.

### b. *"Severe or Pervasive" Element*

Defendants next argue that the dissemination of the photos does not meet the required "severe or pervasive" standard, as it was an isolated incident, and "a reasonable woman might find the photographs embarrassing," but not overly hostile.[4] The Court disagrees.

In determining whether harassment is "severe or pervasive," discrimination is pervasive when incidents "occur either in concert or with regularity." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir.1990). "Isolated incidents" are only severe enough to sustain a claim for a hostile work environment if "extremely serious." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). No "magic threshold" exists as to a number of required incidents, and frequency must be balanced against other factors, such as "its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Faragher*, 524 U.S. at 787–788; see also *West v. PECO*, 45 F.3d 744, 757 (3d Cir.1995) ("frequency. . . is to be considered in context, including the severity of the incidents").

The dissemination of Plaintiff's nude photos is "severe" in this context. Not only were the photos and accusatory letter sent to Plaintiff's workplace, where they were received by Ms. Nardelli, but they were also sent to Major Schultheis at his home, and to Assistant Chief Allen's office in Trenton. The accompanying letter accused Plaintiff of sleeping with both Major

---

[4] Defendants extraneously note that Plaintiff willingly posed for the nude photos. As the Eighth Circuit stated in *Burns v. McGregor Elec. Indus., Inc.*, 989 F.2d 959, 963 (8th Cir. 1993), a "plaintiff's choice to pose [nude] outside work hours is not material to the issue of whether plaintiff found her employer's work-related conduct offensive."

Schultheis and Lt. Pinder, and of using these alleged sexual relationships to her advantage. These accusations, combined with Plaintiff's private nude photographs, being sent to three significantly superior individuals in the workplace is severe and humiliating, and would cause a reasonable employee immense stress.

Additionally, the dissemination of nude photos was not an isolated incident, as Defendants suggest. Plaintiff's coworker, Operator Tepper, made reference to Plaintiff sleeping with Lt. Pinder when she shouted into the work area, "Melanie's a fucking snitch! Some one needs to let her know that Pinder's not here anymore and nobody fucking cares!" (Def. SOF ¶41.) A jury could find that the reference being made—that Plaintiff could no longer make reports to the man she was allegedly sleeping with—again accused Plaintiff of trading sex for favors, this time in front of her peers as well as her superiors. In response to this comment by Tepper, Plaintiff's superior, Lt. Egbert, stated "that's ok, we know who the snitches are and we're gonna take care of that." (Def. SOF ¶43.) A jury could further find that Lt. Egbert was insinuating that he would take action against Plaintiff for her alleged relationship. Such threats from a superior, as well as the many threatening anonymous notes Plaintiff received—some as simple as "snitch," and others as hostile as "you'll get yours"—could certainly "unreasonably interfere[] with an employee's work performance." *Faragher*, 524 U.S. at 787–788. Plaintiff alleges that the working environment was so hostile that in October 2015, she was "hospitalized medically after collapsing and experiencing stroke-like symptoms." (Doc. 86-2 at 9.)

There is sufficient evidence here to find that the workplace harassment was severe and pervasive enough for a reasonable woman to believe the working environment is hostile or abusive in accordance with the standards set out in *Lehmann*.

### c. *Defendant's Liability as Plaintiff's Employer*

Though summary judgment is inappropriate based on Defendants' argument that Plaintiff cannot establish a hostile working environment, the Court must still inquire as to whether Defendants can be held liable for harassment inflicted on Plaintiff.

Defendants claim they cannot be held liable for any harassment Plaintiff faced, arguing that the NJDOC promptly responded to Plaintiff's complaints by maintaining "an effective anti-harassment policy" and by conducting multiple investigations, which eventually concluded that Plaintiff had not faced harassment. (Def. Reply at 15.).

Plaintiff argues in response that Assistant Chief Allen, to whom she allegedly reported to regarding SCO Cunningham's investigation, "was provided with information from [Plaintiff] about what was happening in Bayside State Prison almost daily via phone calls and texts from at least March 2014, but did absolutely nothing to prevent the harassment or discrimination." (Pl. Resp. at 18.) She claims that under DOC policies it was part of Allen's job to initiate investigations and share information. (*Id.*) She adds that the Special Investigations Division and the Equal Employment Division botched their investigations into her complaints, and that the NJDOC policies fail to provide effective guidelines for addressing sexual harassment. (*Id.* at 19–21.)

### i. *Defendant's Liability for Supervisor Conduct*

Defendants argue that they cannot be held liable for Lt. Egbert's conduct towards Plaintiff. (Def. Mot. at 34.) An employer's liability under the NJLAD for claims related to sexual harassment by a supervisor is a case-specific inquiry. *Lehmann*, 626 A.2d at 464. Generally, an employer can be held vicariously liable for the conduct of a supervisor where the supervisor acted within the scope of his or her employment. *Id*. Where the supervisor acted outside the scope of his or her employment, the employer can be held vicariously liable "if the employer contributed to the harm

through its negligence, intent, or apparent authorization of the harassing conduct, or if the supervisor was aided in the commission of the harassment by the agency relationship." *Id*.; *see also Herman v. Coastal Corp*., 348 N.J.Super. 1, 791 A.2d 238, 251 (explaining that an employer cannot be held liable for sexual harassment under the NJLAD "in the absence of a showing that the harassing employee was acting within the scope of his employment, or that the employer was negligent, or had intended the conduct.")

Thus, as explained by the New Jersey Supreme Court in *Lehmann*, "an employer can be held liable for compensatory damages stemming from a supervisor's creation of a hostile work environment" in one of three circumstances: (1) where "the employer grants the supervisor the authority to control the working environment and the supervisor abuses that authority to create a hostile work environment[;]" (2) where "the employer ha[s] actual or constructive notice of the harassment[;]" or (3) where, in the absence of actual or constructive notice, "the employer negligently or recklessly failed to have an explicit policy that bans sexual harassment and that provides an effective procedure for the prompt investigation and remediation of such claims." 626 A.2d at 464.

As reflected in the record, Defendants' response to Plaintiff's complaints about her supervisor, Lt. Egbert, meets the standard required by *Lehmann*. Lt. Egbert contributed to the alleged hostile environment through his "we know who the snitches are" statement, as well as his attempt to file disciplinary charges against Plaintiff. When Plaintiff filed a complaint about the "snitches" statement, Major Schultheis took remedial measures that same day, reassigning Lt. Egbert to a different area of the prison. (Def. SOF ¶45; Doc. 82-3 at 142 ("Defense Exhibit 15").) Major Schultheis then immediately referred the report to SID and the EED liaison. (Pl. SOF ¶47; Doc. 82-3 ("Def. Exhibit 18").)

As set out in *Lehmann*, an employer may be liable "[i]f a plaintiff can show that an employer had actual knowledge of the harassment and did not promptly and effectively act to stop it." 626 A.2d at 463. Here, Plaintiff made her employer aware of Lt. Egbert's actions by reporting him; prompt action was then taken in the form of immediately transferring Lt. Egbert and referring Plaintiff's report for further investigation. Plaintiff's employer did not ignore her complaint or allow Lt. Egbert to continue working in the same space. As appropriate remedial measures were taken, Defendants are not liable for sexual harassment for a supervisor's conduct.

        *ii.*    *Anti-harassment Policy*

Plaintiff also argues that Defendants are liable because their anti-harassment policy is inadequate, as it failed to require Ms. Nardelli, the EED liaison, to correct inaccuracies in reports or to inform anyone at EED about multiple similar pending claims. (Pl. Resp. at 20.) Plaintiff claims this shortcoming resulted in the DOC supporting her coworkers' alleged harassing conduct, rather than halting it. (*Id.* at 21.) Ms. Nardelli also failed to follow policy by wearing gloves as required when opening the package containing Platiniff's nude photos; this failure caused any fingerprint evidence to be lost, impeding the investigation. (Pl. SOF ¶56.) Plaintiff further alleges that the investigations conducted into her complaints were inadequate, as they failed to interview necessary witnesses or review relevant evidence, and made incorrect determinations. (Pl. SOF ¶83–93.)

Under New Jersey law, "if an employer has exercised due care in acting to prevent a sexually discriminatory hostile work environment, vicarious liability should not attach. The establishment of an effective anti-sexual harassment workplace policy and complaint mechanism evidences an employer's due care and may provide affirmative protection from vicarious liability." *Gaines v. Bellino*, 173 N.J. 301, 801 A.2d 322, 323 (N.J.2002); see also *Cavuoti*, 735 A.2d at 556

(recognizing that New Jersey law "afford[s] a form of a safe haven [from vicarious liability for the harassing conduct of an employee] for employers who promulgate and support an active, anti-harassment policy.")

In assessing whether an employer may reap the benefit of that safe haven, the following circumstances are "relevant: periodic publication of the employer's anti-harassment policy, the presence of an effective and practical grievance process for employees to use, and training for workers, supervisors, and managers concerning how to recognize and eradicate unlawful harassment." *Gaines*, 801 A.2d at 330 (citing *Cavuoti*, 735 A.2d at 556).

Additionally, "[a]n employer has a clear duty not only to take strong and aggressive measures to prevent invidious harassment, but also to correct and remediate promptly such conduct when it occurs." *Herman*, 791 A.2d at 252 (citing *Payton v. New Jersey Turnpike Auth.*, 148 N.J. 524, 691 A.2d 321, 327–28 (N.J.1997)). As the New Jersey Supreme Court noted in *Gaines*, "[t]he efficacy of an employer's remedial program is highly pertinent to an employer's defense" that its actions absolve it from all liability for a plaintiff's claims. 801 A.2d at 330 (citing *Payton*, 691 A.2d at 327). "[E]ffective remedial measures. . . include the process by which the employer arrives at the sanctions that it imposes on the alleged harasser" and are reviewed in light of the "investigation—including [its] timeliness, thoroughness, [the] attitude toward the allegedly harassed employee, and the like—as well as by the result." *Payton*, 691 A.2d at 327.

Here, Plaintiff's complaints about the nude photos and harassing conduct by her coworkers were addressed in a series of investigations. The EED investigation was initially completed on November 5, 2014, approximately two months after Plaintiff filed her EED complaint. (Def. SOF 75–78.) Plaintiff appealed the EED's determination that she had not been sexually harassed, and the CSC found in her favor, noting that the EED had not interviewed necessary witnesses,

including the witness that Plaintiff alleged was the source of the nude photo dissemination. The CSC also found that the photos "clearly implicated the State Policy Prohibiting Discrimination." (Def. SOF ¶¶86–88.) On remand, the EED interviewed the additional witnesses; it took until April 2015 to again determine that the State Policy Prohibiting Discrimination in the Workplace had not been violated. (Def. SOF ¶94.)

While existence of an anti-harassment policy and the investigation of complaints are helpful for the employer, both must actually be effective in order to preclude liability. *See, e.g., Lane v. Sears Logistics Servs., Inc.*, Civ. No. 11-6157, 2014 WL 1301549 at *10 (D.N.J. Mar. 31, 2014) (denying summary judgment on a sexual harassment hostile work environment claim because of Defendant's "failure to implement effective remedial measures"). In determining whether Defendants implemented effective remedial measures, several issues of fact remain undecided. Defendants claim that Plaintiff "could not identify any additional harassing or retaliatory behavior against her after September 1, 2014." (Def. Reply at 13.) However, this is contradicted by Defendants' own admission that Plaintiff received another anonymous note on September 8, 2014. (*Id.*) Plaintiff alleges that the workplace remained hostile to the point that, in October 2015, she was "hospitalized medically after collapsing and experiencing stroke-like symptoms." (Doc. 86-2 at 9.) Whether Defendants resolved the harassing behavior by September 1, 2014, or whether it continued afterwards is a fact the parties dispute with record evidence. The parties also dispute whether Assistant Chief Allen knew of or was required to address Plaintiff's situation. Further, Ms. Nardelli's improper handling of the photo packages, combined with Defendants' failure to initially interview the witness that Plaintiff named as the potential source of the nude photos, suggests that though an anti-harassment policy existed, the investigations based upon that policy may have been inadequate.

Because issues of fact exist as to whether Defendants failed to implement effective remedial measures in response to harassing behavior, summary judgment is denied on Plaintiff's sexual harassment hostile work environment claim. *See Lane*, 2014 WL 1301549 at *10 (denying the defendant's motion for summary judgment on the plaintiff's hostile work environment claim because "a reasonable jury could conclude that" defendants failed "to implement effective remedial measures").

## IV.     CONCLUSION

For the reasons expressed herein, Defendants' motion is hereby **GRANTED** in part as to Plaintiff's individual claims against Daniel Opperman, Erin Nardelli, and Charles Egbert, as well as Plaintiff's NJFLA claim (Count III) and Plaintiff's gender discrimination claims under the NJLAD and Title VII. Defendants' motion for summary judgment is **DENIED** as to Plaintiff's retaliation claim under the NJLAD and Title VII, and Plaintiff's sexual harassment hostile work environment claim under the NJLAD. An accompanying Order shall issue.


Dated: 10/25/2019                                                    /s/ Robert B. Kugler
                                                                     ROBERT B. KUGLER
                                                                     United States District Judge